**In re Ronald SCHLESINGER, Debtor.**

**Ronald Schlesinger, Plaintiff,**

**v.**

**United States [1], Defendant.**

**Bankruptcy No. 00–35288F.
Adversary No. 01–0088.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 31, 2002.

---

1. The debtor named the "U.S. Department of Treasury Internal Revenue Service" as the defendant in this proceeding. In its post-trial brief, the defendant notes that the "United States" is the proper party defendant and should be substituted as such. Defendant's Brief at 3. *See, e.g., Blachy v. Butcher,* 221 F.3d 896, 909 (6th Cir.2000), *cert. denied,* 532

U.S. 994, 121 S.Ct. 1653, 149 L.Ed.2d 636 (2001); *In re Smith*, 205 B.R. 226, 227 n. 1 (9th Cir. BAP 1997) ("It is a well settled principle that the IRS cannot be sued and the proper party in actions involving federal taxes is the United States of America.") (citations omitted); *In re Campbell*, 186 B.R. 731, 732 n. 1 (Bankr.N.D.Fla.1995). Therefore, as the defendant requests, the "United States" has been substituted as the defendant. *See, e.g., id.*

Helen C. Lee, Philadelphia, PA, for Debtor.

Mitchell W. Miller, Philadelphia, PA, trustee.

## MEMORANDUM

BRUCE I. FOX, Chief Judge.

The plaintiff, Ronald Schlesinger, filed a voluntary petition in bankruptcy under chapter 7. He has now filed an adversary proceeding seeking a determination that his pre-bankruptcy federal tax obligation to the United States, in the amount of $473,000.00, is dischargeable. The United States opposes this relief. It argues that the tax debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(1)(C).

Trial on this proceeding has taken place, and both parties have submitted thoughtful post-trial memoranda. This proceeding is now ripe for determination.

### I.

Upon consideration of all of the evidence presented, I make the following findings of fact:

1. Mr. Schlesinger holds a Bachelor of Science degree from Drexel University. N.T. at 42. He graduated in 1972. Ex. G–30 at 33.

2. In 1967, Mr. Schlesinger began working for Colonial Mortgage Services

Corporation, the predecessor in interest to his current employer, GMAC Mortgage Corporation. N.T. at 42; Ex. G–30 at 32–33.

3. By the early 1980's, the debtor had become a mortgage loan officer for GMAC. N.T. at 16, 42–43. He concentrated his sales efforts on large local home builders, who would then refer their customers to GMAC for loans. Although he initiated the loans, the debtor was not involved with loan underwriting decisions. N.T. at 43–44; Ex. G–30 at 34.

4. By 1983, Mr. Schlesinger was earning annual commissions in excess of $250,000.00. Ex. G–30 at 36.

5. In 1989 or 1990 through 1997, he was engaged by GMAC to travel to its other branch offices to train loan officers in obtaining new mortgage business. N.T. at 44; Ex. G–30 at 37–38. During that time period, he earned between $150,000.00 and $275,000.00 annually. Ex. G–30 at 38.

6. In 1982, the debtor became friends with David Betesch. N.T. at 5; Ex. G–30 at 14. David Betesch, along with his brother Martin Betesch, owned a video rental store in Southwest Philadelphia and urged Mr. Schlesinger to invest in their business. N.T. at 5; Ex. G–30 at 12, 14, 17. Eventually, in 1987, he agreed to do so. Ex. G–30 at 16. His accountant may have advised against this investment. N.T. at 119.

7. On or about December 1987, Mr. Schlesinger and the Betesch brothers formed a Subchapter S corporation known as Chooney Juice, Inc. N.T. at 5; Ex. G–9A. The debtor was a shareholder, officer and director of this corporation. N.T. at 52; Ex. G–30 at 63; Ex. G–23. He also engaged and paid attorneys to incorporate this video rental business. Ex. G–22.

8. Mr. Schlesinger testified that, after this corporation was formed, he retained his full-time position with GMAC Mortgage Corp., and his wife briefly became an employee of the business. At no time did he perform any duties for Chooney Juice. N.T. at 6–7, 16. He did, however, receive a letter from U.S.A. Video offering to purchase the business of Chooney Juice, Ex. G–24, which offer was not accepted by the corporation.

9. The Betesch brothers decided that Chooney Juice needed to expand its store locations. They convinced Mr. Schlesinger that if the number of stores increased, the new business entity would be able to sell its "chain" of stores to a larger chain such as West Coast Video. N.T. at 7–8; see also Ex. G–24.

10. At the time Chooney Juice was formed, Mr. Schlesinger had substantial savings and was earning a salary in excess of $100,000.00 per year. N.T. at 8, 58.

11. The debtor agreed with the Betesch brothers to provide the needed financial backing to increase the number of stores. Ultimately, the corporation owned approximately eight stores in the Philadelphia area. N.T. at 62. The video rental stores were operated under the name of Budget Video. N.T. at 71; Ex. G–24.

12. The debtor testified that each of the Chooney Juice stores obtained its capital in the same fashion. The debtor withdrew from his savings 25% of the total cost to establish the store. The corporation borrowed the remaining 75% from Bell Savings and Loan Association ("Bell Savings"), with Mr. Schlesinger serving as one of a number of guarantors. N.T. at 54, 56–57; see also Ex. G–12A.

13. For example, the first new store opened by Chooney Juice cost $300,000.00. The debtor invested $75,000.00, and the

corporation borrowed $225,000.00. N.T. at 58.

14. The debtor testified that he trusted the Betesch brothers and never saw any financial reports from Chooney Juice after the corporation was formed. N.T. at 7.

15. Chooney Juice engaged an accounting firm and filed federal S Corporation tax returns for calendar years 1987 and 1988. Exs. G–9A, G–9B.

16. Chooney Juice did not file any federal tax returns thereafter. N.T. at 118.

17. Chooney Juice sent to the debtor K–1 schedules for calendar years 1987 and 1988.[2] N.T. at 9. It did not file or send the debtor any K–1 schedules thereafter. N.T. at 9–10, 92.

18. By 1989 or 1990, Chooney Juice was operating at a loss and was not repaying its bank loans. *See* Ex. G–26. Bell Savings brought suit against the debtor, his wife, Chooney Juice, the Betesch brothers and the predecessor corporation on delinquent promissory notes. Ex. G–10B. Mr. Schlesinger and his wife were represented by counsel during that litigation. Ex. G–10C.

19. Bell Savings prevailed in its lawsuit and issued two writs of execution in the amounts of $37,868.43 and $182,749.14 respectively. Exs. G–11A, G–12A.

20. The debtor testified that he satisfied these judgments, in part, through garnishment of his bank accounts. N.T. at 81–82.

21. By 1991, Bell Savings was taken over by the Resolution Trust Corporation ("RTC"). Ex. G–10B. The debtor testified that he did not know how to obtain bank records to support his investment claim after this takeover. N.T. at 30.

22. In 1992, Mr. Schlesinger was told by the Betesch brothers that Chooney Juice was out of business and that a fire had destroyed the location where the business records were located. N.T. at 27–28. Furthermore, he was told that all inventory of the corporation had been sold. N.T. at 37.

23. In preparation for his 1992 federal income tax return, Mr. Schlesinger informed his accountant, Art Cohn, that his investment in Chooney Juice, Inc. was completely lost. N.T. at 5–6.

24. Mr. Cohn was a partner with the accounting firm of Goldenberg, Rosenthal and Friedlander, LLP in Philadelphia. N.T. at 10, 90. This firm had prepared the debtor's federal tax returns for many years, including tax years preceeding his investment in Chooney Juice. N.T. at 12, 66.

25. Mr. Cohn attempted to gain financial information, including a schedule K–1, from the accountants for Chooney Juice (Isdaner & Co.) without success. He was informed that the corporation had not paid for accounting services and no tax schedules would be prepared. N.T. at 92. The debtor informed Mr. Cohn that Bell Savings was out of existence, and they both decided that the loan documents were unavailable to them.[3] N.T. at 111, 114.

**2.** For federal tax purposes, an S Corporation does not pay federal taxes. Instead, its income is passed on to its shareholders who report their pro rata shares on their individual returns. *See Durando v. United States,* 70 F.3d 548, 550 n. 2 (9th Cir.1995). The corporation files an informational return with the IRS and sends completed schedule K–1 forms to each shareholder to notify him of his pro-

portionate share of corporate income and expenses. *See In re Sholdra,* 270 B.R. 64, 66 n. 6 (Bankr.N.D.Tex.2001).

**3.** The debtor also testified that, in 1991, Bell Savings consolidated all of the outstanding loans into one loan for $479,000.00 and that he might have discarded the prior loan documents at that time. N.T. at 69, 74.

26. The debtor provided to Mr. Cohn some information regarding his investment in Chooney Juice, including some canceled checks and loan documents. N.T. at 11, 35, 93. The debtor testified that his own personal records, which were stored at his office with GMAC, had been lost or discarded. N.T. at 60–61.

27. Based upon information provided to him by the debtor, Mr. Cohn determined that the debtor had lost $998,502.00 in Chooney Juice and assisted Mr. Schlesinger in preparing his 1992 tax return to that effect. N.T. at 94, 107; Ex. G–4A.

28. Mr. Cohn helped prepare, and the debtor signed, a form 1040 federal income tax return for 1992 reporting his lost investment as a loss deduction against ordinary income. N.T. at 91; Ex. G–4A. Because he had no corroborating information from the S Corporation, the debtor included with his tax return a completed Form 8082: "Notice of Inconsistent Treatment or Amended Return," which form was prepared by his accountant. N.T. at 94; Ex. G–4A.

29. As an attachment to Form 8082, Mr. Cohn, on behalf of the debtor, had typed an explanation for the deduction of the Chooney Juice investment. Ex. G–4A.

30. In addition to taking a deduction against earned income on his 1992 return, Mr. Schlesinger (on the advice of Mr. Cohn) treated the unused portion of the $998,502.00 loss as a net loss carryback and carryforward. Ex. G–31 at 20–21. He filed amended tax returns for the years 1989 through 1991 and reduced his taxable income from 1992 through 1995 with this net operating loss. He also obtained a tax refund for that period in excess of $135,000.00. Amended Joint Pretrial Statement at 2.

31. In 1996, the IRS challenged the debtor's asserted Chooney Juice deductions on his tax returns from 1989 to 1995. The debtor's accountants prepared a response. Ex. G–26.

32. Ultimately, on October 15, 1999, the IRS District Counsel explained the government's position. The debtor could substantiate only $258,076.00 of investment loss associated with Chooney Juice. N.T. at 134; Ex. P–1. Furthermore, the proven loss could only be treated "as short-term capital loss under I.R.C. section 166" and not as ordinary loss against earned income. N.T. at 139; Ex. P–1.

33. As a result, the IRS asserted that the debtor was not entitled to any loss carrybacks or carryforwards and was limited in his deduction for 1992. N.T. at 134; Ex. P–1.

34. Although the debtor had challenged the IRS's determination by filing suit in the United States Tax Court on December 21, 1999, he entered into a consent judgment agreeing with the IRS's position. Ex. G–17. As a result, his total tax deficiencies were determined to be $473,000.00. Ex. G–17. On February 22, 2000, the IRS assessed the debtor's tax liability. Amended Joint Pretrial Statement of Uncontested Facts at 3. He filed the instant chapter 7 bankruptcy petition on December 8, 2000.

35. At no time did the IRS assert that the debtor had committed civil tax fraud. N.T. at 134.

36. In April 2002, Mr. Schlesinger wrote a summary of his losses associated with Chooney Juice and estimated that total at $970,000.00. Ex. G–27.

37. The debtor testified that he was foolish and naive in his investment with Chooney Juice. Not only did he lose his investment, but he lost his home, his wife filed for divorce, and he became severely depressed as a result. He also saw his

position with GMAC reduced, both in salary and responsibilities. N.T. at 13–14, 15.

38. At the time of the hearing, the debtor was taking anti-depressant medication. N.T. at 40–41.

39. The debtor also invested in "tax shelter" partnerships, N.T. at 24, 26, which investments were also disallowed as a loss in the approximate amount of $27,000.00. N.T. at 26, 79–80. That deduction was repaid in full, with interest and penalties, after the debtor's various appeals were unsuccessful. N.T. at 80.

40. The debtor testified that he was "stupid" in not overseeing his investment in Chooney Juice, N.T. at 70, and neglectful in not maintaining supporting documents, but he also stated that he actually lost almost $1 million of his money in these video stores. N.T. at 79.

## II.

Based upon these facts, I reach the following legal conclusions:

1. This bankruptcy court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I), 1334(b).

2. The plaintiff seeks a determination that his prepetition federal tax obligation is dischargeable. As this obligation falls outside the scope of 11 U.S.C. § 507(a)(8)(A), it is a non-priority debt which will be discharged unless the provisions of 11 U.S.C. § 523(a)(1)(C) apply.

3. The defendant, the United States, has the burden of persuasion to demonstrate the applicability of section 523(a)(1)(C) by a preponderance of the evidence.

4. The defendant has attempted to demonstrate that the plaintiff's 1992 federal income tax return was either fraudulent or was a willful attempt to evade the plaintiff's federal income tax liabilities.

5. The defendant has not met its burden of persuasion under section 523(a)(1)(C).

6. Accordingly, the plaintiff's prepetition tax obligation to the United States is dischargeable.

## III.

As noted at the outset of this case, the only issue before me is the dischargeability of the debtor's pre-bankruptcy federal tax obligations, arising in calendar years 1989 through 1995. Prior to his bankruptcy filing, the debtor agreed to the entry of judgment against him in the United States Tax Court. Ex. G–17. The debtor has also agreed that his prepetition tax liability is $473,000.00. Amended Joint Pretrial Statement at 3.

Mr. Schlesinger filed his bankruptcy petition in December 2000. As a general bankruptcy principle, tax obligations which were incurred more than three years before the date of the bankruptcy filing are typically dischargeable under section 523. *See, e.g., McKay v. United States,* 957 F.2d 689, 691 (9th Cir.1992); *In re Kramer,* 215 B.R. 87, 88 (S.D.Fla.1997). Among the exceptions to this general principle are the provisions of section 523(a)(1)(C). This subsection provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

\* \* \* \* \* \*

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax ....

There is no limitations period on this exception; any tax liability involving a "fraudulent return" or a "willful attempt to

evade or defeat" payment of the tax liability is nondischargeable, whenever it arose. *See, e.g., United States v. Weiss*, 2000 WL 1708802, at *5 (E.D.Pa.2000), *aff'd*, 32 Fed. Appx. 32 (Table), 2002 WL 397717 (3d Cir.2002); *accord Matter of Brackin*, 148 B.R. 953, 956 (Bankr.N.D.Ala.1992). The United States has the burden to prove, by a preponderance of the evidence, the non-dischargeability of the debt. *See, e.g., In re Fretz*, 244 F.3d 1323, 1327 (11th Cir. 2001); *Berkery v. C.I.R.*, 192 B.R. 835, 840 (E.D.Pa.1996), *aff'd*, 111 F.3d 125 (3d Cir. 1997) (Table), *and cert. denied*, 522 U.S. 881, 118 S.Ct. 208, 139 L.Ed.2d 144 (1997). Accordingly, if the United States establishes by the preponderance standard that Mr. Schlesinger either made a fraudulent tax return or willfully attempted to evade or defeat his tax obligations, then his pre-bankruptcy tax liabilities will not be discharged. *See, e.g., In re Fegeley*, 118 F.3d 979, 983 (3d Cir.1997). Conversely, if that burden is not met, then the debtor is entitled to relief in this proceeding. As with other exceptions to discharge, the provisions of section 523(a)(1)(C) "are to be strictly construed in favor of the debtor." *Id.*

■ "In construing the fraud prong under § 523(a)(1)(C), Courts have analogized it to the civil fraud penalty under the Internal Revenue Code, 26 U.S.C. § 6663." *Berkery v. C.I.R.*, 192 B.R. at 841. In order to demonstrate that a debtor filed a "fraudulent return," the United States must demonstrate under section 523(a)(1)(C) (and also under section 6663 of the IRC): (1) knowledge of the falsehood of the return; (2) an intent to evade taxes; and (3) an underpayment of the taxes. *See, e.g., Matter of Brackin*, 148 B.R. at 956; *In re Hopkins*, 133 B.R. at 106; *In re Kirk*, 98 B.R. 51, 54 (Bankr.M.D.Fla.1989); *see also* Dunham & Shimkus, *Tax Claims in Bankruptcy*, 67 *Am. Bankr.L.J.* 343,

387 (1993). "[W]here the debtor signed a return which he knew was false, and which resulted in underpayment of tax, fraud is committed." *Id.* (citing *In re Hopkins*, 133 B.R. at 107). Conversely, when the debtor is unaware of his tax liability when his return is filed, there is no fraudulently filed return. *Id.* (citing *In re Gathwright*, 102 B.R. 211 (Bankr.D.Or.1989)).

■ In order to determine whether the elements of a fraudulent return have been established, one must consider the entire evidentiary record with particular regard for circumstantial evidence. *Berkery v. C.I.R.*, 192 B.R. at 841. To assist in this analysis, some courts have enumerated the following non-exclusive list of circumstances which may lead to the inference that the debtor/taxpayer filed a fraudulent tax return: (1) large understatements of income made consistently over time; (2) failure to keep adequate records; (3) failure to file tax returns; (4) implausible or inconsistent behavior by the taxpayer; (5) concealing assets; (6) failure to cooperate with taxing authorities; (7) the illegality of the activity generating the additional unreported income; and (8) the relative sophistication of the debtor. *Id.* at 841 (citations omitted).

Conduct by a taxpayer which would constitute a "willful" evasion of taxes for purposes of section 523(a)(1)(C) has been analogized to the standard applicable in IRC § 6672:

> a debtor will be considered to have willfully attempted to evade a tax if he acted voluntarily, consciously or intentionally or with reckless disregard for whether the tax has been paid. With respect to § 523(a)(1)(C), a debtor acts with reckless disregard if he knew or should have known that the tax was due and did not pay the tax.

*In re Irvine*, 163 B.R. 983, 987 (Bankr. E.D.Pa.1994); *accord Berkery v. C.I.R.*,

192 B.R. at 843; *In re Fuller*, 189 B.R. 352, 356 (Bankr.W.D.Pa.1995).

The Third Circuit Court of Appeals restated this interpretation by borrowing from the Seventh Circuit:

> "The plain language of the second part of § 523(a)(1)(C) comprises both a conduct requirement (that the debtor sought 'in any manner to evade or defeat' his tax liability) and a mental state requirement (that the debtor did so 'willfully')."

*In re Fegeley*, 118 F.3d at 983 (quoting *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996)); *accord In re Tudisco*, 183 F.3d 133, 136 (2d Cir.1999) ("The willfulness exception consists of a conduct element (an attempt to evade or defeat taxes) and a mens rea requirement (willfulness).").

 Again, courts consider circumstantial evidence in determining "willfulness." *See, e.g., In re Fegeley*, 118 F.3d at 983; *In re Irvine*, 163 B.R. at 987. Such circumstantial evidence may include the debtor's conduct over a period a time, which period may extend beyond the due date of the tax liability. *See United States v. Weiss*, 2000 WL 1708802, at *3. The debtor's failure to pay all required taxes does not, by itself, establish "willfulness." *In re Fegeley*, 118 F.3d at 983;[4] *accord In re Tudisco*, 183 F.3d at 136.

I now consider whether the United States has demonstrated either of the two bases for non-dischargeability under section 523(a)(1)(C).[5]

## IV.

### A.

The positions of the parties, in applying the facts of this dispute to the relevant legal standards, may be stated in the following manner:

The United States contends that Mr. Schlesinger filed "a fraudulent [tax] return and willfully attempted to avoid the assessment and payment of his [tax] liabilities ...." Defendant's Post–Trial Brief at 2. It emphasizes the following facts: the debtor's inability to corroborate the amount of his extensive 1992 tax deduction due to his failure to retain or obtain business records; his inability to justify the legal nature of that deduction even if the amount had been corroborated; his persistent appeals and Tax Court lawsuit; and his bankruptcy filing timed just beyond 240 days after his taxes were assessed.[6]

In support of its position, the government argues that it is incredible for Mr. Schlesinger to have lost almost $1 million in a business venture and have minimal

---

**4.** In *Fegeley*, the Third Circuit instructed that a debtor's "intentional failure to file his tax returns, together with his failure to pay taxes when he had the resources to do so, was sufficient to prove that he attempted to evade or defeat his tax liabilities for the tax years at issue." *In re Fegeley*, 118 F.3d at 984. Moreover, a debtor's knowledge of his duty to file tax returns and his voluntary and intentional failure to do so would constitute "willfulness." *Id.*

**5.** The statute is written in the disjunctive, so one must consider both components. Clearly, when the taxpayer/debtor never filed any return, he cannot be found to have made a "fraudulent return." Only the issue of willful

evasion would be germane. When, however, a tax return has been filed—as in this dispute—I have noted previously that the two elements of section 523(a)(1)(C) may overlap. *In re Graham*, 1994 WL 777359, at *5 (Bankr. E.D.Pa.1994).

**6.** Under 11 U.S.C. § 507(a)(8)(A)(ii), federal income taxes assessed within 240 days of a debtor's bankruptcy filing are entitled to priority treatment in bankruptcy cases. *See generally In re de Jesus*, 268 B.R. 185 (Bankr. D.Minn.2001). Under section 523(a)(1)(A), tax liabilities entitled to priority treatment are not discharged in chapter 7 cases. *See, e.g., In re Lewis*, 199 F.3d 249, 251 (5th Cir.2000).

records to support this contention. He is a college graduate, a successful businessman and a long time employee of a lending entity. He had invested in businesses before, including tax shelters.

Had this loss actually occurred, the government reasons, the debtor would have had some business records, canceled checks or loan documents to corroborate his loss. The absence of such corroboration for such a large loss occurring over a number of years makes it likely to the defendant that the claimed loss was in fact fictitious and that the debtor knew it when he filed his return.

In further support of its position that Mr. Schlesinger knowingly falsified his claimed 1992 deduction, the United States refers to the debtor's inconsistent statements regarding the precise amount of invested money borrowed versus the amount taken from existing savings, his officer position with Chooney Juice, Inc. and his failure to attempt to obtain bank records from the RTC during the course of state court litigation.

Finally, the government notes that Mr. Schlesinger's improper attempts to use tax shelters, his continued litigation which delayed any tax assessment and his timing of this bankruptcy filing beyond the 240 day reach-back period suggests that the debtor is an intelligent individual who has exhibited a pattern of tax avoidance.

Thus, the government maintains that the debtor's filed 1992 tax return (with its loss carrybacks and carryforwards) was both fraudulent and a willful attempt by him to evade his proper tax liabilities.

The debtor's counter-position is that he may have been foolish and careless in handling his own business affairs, but he neither acted willfully nor fraudulently when he claimed his disallowed tax loss in 1992.

He suggests that a combination of events—*i.e.,* the closing of Bell Savings; his mental depression, caused by the faithlessness of his business partners, his loss of money and his marital breakup; his habit of storing documents haphazardly at his office; his movement down the ranks of his employer—when joined with his foolishness and carelessness have left him without the corroboration needed to justify his claim to the IRS. Nonetheless, he contends that his testimony about his investment in Chooney Juice and the loss of that investment was truthful.

He notes that the IRS ultimately agreed that he had invested almost $300,000.00 in that failed business venture and accentuates the government's failure to seek any fraud penalties against him as support for his position. He also emphasizes that he filed his 1992 federal tax return and took the challenged tax deduction after consultation with an experienced accountant. This accountant testified that Mr. Schlesinger acted upon professional advice and without any fraudulent or willful intent; moreover, his 1992 federal income tax return contained an additional tax form which made no attempt to hide from the IRS the nature of his deduction or his difficulties in corroborating the amount claimed to be lost.

Furthermore, the debtor emphasizes that his prepetition tax obligation was fixed by the IRS without any reference to civil fraud. Instead, the IRS determined—and the debtor ultimately agreed—that he could not meet his burden under the Internal Revenue Code to substantiate his claimed deduction and that he did not establish a proper statutory basis for that deduction. Neither finding, in the debtor's view, supports the government's position in this proceeding.

### B.

As can be observed from these two summaries, both parties either explicitly or implicitly focus upon the credibility of Mr. Schlesinger concerning both the existence of his business investment and the reasons he is unable to corroborate the total amount lost. To the extent his testimony is deemed credible, the defendant may be unable to meet its burden to demonstrate a fraudulent return or willful attempt to evade taxes. *See, e.g., In re Frosch,* 261 B.R. 181, 185–86 (Bankr.E.D.Pa.2001) (although the debtor wrongfully claimed mortgage interest and home business deductions on property he did not own, credible testimony precluded a finding of non-dischargeability under section 523(a)(1)(C)); *In re Rigney,* 216 B.R. 65, 69 (Bankr.N.D.Ala.1997) ("Because the Court found the testimony of [the debtor and his company's bookkeeper] to be credible and the explanations offered by each of them for the allegedly incorrect items on the returns to be consistent and entirely reasonable, the Court concludes that [the debtor] did not knowingly file a false return in an effort to evade his taxes."). Conversely, if the debtor's testimony is not found credible, then the government may meet the statutory standard for non-dischargeability. *See In re Rivers v. U.S.,* 178 B.R. 9, 12 (S.D.Ala.1994) ("The bankruptcy court did not err in finding that [the debtor's] testimony carried little weight in comparison to the competent written and oral evidence of fraud presented by the United States.").

In so resolving the issue of the debtor's credibility (and that of his former accountant), I must analyze whether the United States has demonstrated by a preponderance of the evidence, viewing all the facts, that it is more likely than not that Mr. Schlesinger knew when he filed his 1992 return that the tax deduction contained therein had no real basis in fact or law and that it was claimed wrongfully either to avoid payment of his lawful tax liabilities or to obtain an improper tax refund. *See United States v. Weiss,* 2000 WL 1708802, at *2 (knowingly filing inaccurate and understated estimated tax returns may demonstrate a "willful[ ] attempt[ ] ... to evade or defeat" tax obligations within the meaning of section 523(a)(1)(C)); *In re Rigney,* 216 B.R. at 68 (a tax return which understated income by wrongfully claiming that payments from a closely held corporation were "loans" would fall outside the scope of section 523(a)(1)(C) unless the debtor "knowingly filed a false return with the intention of evading taxes"); *In re Miller,* 176 B.R. 266, 268 (Bankr.M.D.Fla. 1994) ("[T]ax obligations should be non-dischargeable when there is evidence that the taxpayer's actions were neither unintentional nor accidental or due to misunderstanding or mere oversight.").

■ Resolution of the credibility issue in this proceeding is not simple. As noted above, both parties may fairly point to certain facts which support their respective positions. In analyzing the evidence offered, however, I afford little importance to the failure of the IRS pre-bankruptcy to raise any issue of civil fraud. *See, e.g., Levinson v. United States,* 969 F.2d 260, 263 (7th Cir.1992), *cert. denied,* 506 U.S. 989, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992); *In re Fernandez,* 112 B.R. 888, 891 (Bankr.N.D.Ohio 1990). I also discount the government's complaint about the debtor's Tax Court litigation or the timing of his bankruptcy petition. There is a "venerable distinction between tax avoidance and tax evasion." *In re Kramer,* 215 B.R. 87, 89 (S.D.Fla.1997). To the extent that a debtor employs legally permissible methods to avoid paying taxes, such conduct does not constitute improper tax evasion.

## C.

■ As I referenced above, the United States must do more in this proceeding than prove that Mr. Schlesinger incurred an unpaid prepetition tax liability. It must demonstrate by a preponderance of the evidence that this obligation arose either from a fraudulent return or from a willful attempt to evade his tax obligation. Upon careful consideration of the evidence presented, including the demeanor of the witnesses who testified, I conclude that the government has not met its burden under section 523(a)(1)(C).

Even the United States concedes that Mr. Schlesinger invested money in a business venture known as Chooney Juice, Inc. and that he was entitled to a significant capital loss deduction. The government acknowledged pre-bankruptcy that the debtor substantiated $258,076.00 of his claimed loss. There is also no doubt that Mr. Schlesinger guaranteed corporate loans made to Chooney Juice by Bell Savings Bank. There are documents proving that he was sued by this lender (and later by the RTC) to recover on the unpaid loans.

Thus, in 1992, when Chooney Juice ceased operations, Mr. Schlesinger was entitled to take some deduction for his losses.

I recognize that, under federal tax law, Mr. Schlesinger took a deduction in an amount larger than that to which he was entitled because he failed to meet his burden to corroborate the amount claimed. *See, e.g., Henry Schwartz Corp. v. Commissioner of Internal Revenue,* 60 T.C. 728, 745–46, 1973 WL 2642 (1973). I further appreciate that he apparently misclassified his deduction under relevant federal tax law. *See generally Klein v. Commissioner of Internal Revenue,* 75 T.C. 298, 1980 WL 4490 (1980).

■ Nonetheless, in applying section 523(a)(1)(C), courts have held that a tax obligation arising from improper tax deductions will be dischargeable if the impropriety of the deduction was unknown to the debtor when his return was filed. *See Matter of Brackin,* 148 B.R. at 958 ("From the evidence presented, the Court cannot find that Brackin intentionally took illegal business deductions or had knowledge of the falsehood of his returns."). This holding has occurred in circumstances where the disallowance of the deduction was based upon a failure of substantiation. *In re Gathwright,* 102 B.R. 211, 214 (Bankr. D.Or.1989); *see also Matter of Howard,* 167 B.R. 684, 689 (Bankr.M.D.Fla.1994). A similar conclusion was reached in circumstances where a debtor improperly claimed corporate distributions as "loans" rather than as "income." *In re Rigney,* 216 B.R. at 68–69.

If Mr. Schlesinger intentionally claimed improper deductions on his 1992 tax return, his prepetition federal tax obligation would be non-dischargeable. *See In re Rivers,* 178 B.R. at 12. But after listening to the testimony of the debtor and that of his former accountant, Mr. Cohn, and upon review of the exhibits, I find their testimony credible on the issues of fraud and willful intent. Mr. Schlesinger believed that he had lost more than $998,000.00 in Chooney Juice; Mr. Cohn also believed that the debtor's losses equaled or exceeded that amount. Both these individuals also believed that they could persuade the IRS of the veracity of this loss, given what they considered to be unusual circumstances. I further accept that the debtor was advised in good faith by Mr. Cohn that the loss could be claimed as a deduction against ordinary income.

That the debtor's belief and Mr. Cohn's advice were wrong does not render the 1992 filed federal tax return fraudulent;

nor does it render Mr. Schlesinger's conduct in filing the return willfully attempting to evade his tax liability.

In reaching this conclusion, I have considered Mr. Schlesinger's educational and employment backgrounds in assessing the credibility of his testimony. I note that, in *Gathwright*, the debtor was a former IRS agent and was a certified public accountant who failed to file timely tax returns, failed to report all income and improperly claimed tax deductions. Nevertheless, the bankruptcy court held that his tax obligation was dischargeable because his failures and errors were only "negligent" and his "business affairs" were conducted in a "sloppy manner." *Gathwright,* 102 B.R. at 216. No fraud or willful evasiveness were proven.

Similarly, I view Mr. Schlesinger's behavior concerning his business investment as careless and negligent, but not fraudulent or willfully evasive. *See Matter of Brackin,* 148 B.R. 953, 958 (Bankr. N.D.Ala.1992); *see also generally In re Blaker,* 205 B.R. 326, 329 (Bankr.M.D.Fla. 1996) (government did not prove that taxpayer filed a fraudulent tax return when the evidence disclosed that the debtor was unaware that his return contained false information).

Therefore, an order shall be entered in favor of the plaintiff determining his tax liability to the defendant to be dischargeable.