**In re: David B. JONES and Linda S. Jones, Debtors.**

**David B. Jones and Linda S. Jones, Plaintiffs,**

**v.**

**United States of America, Internal Revenue Service, Defendant.**

**Bankruptcy No. 8:05–BK–10286–PMG. Adversary No. 8:05–ap–486–PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 14, 2007.

Buddy D. Ford, Tampa, FL, for Plaintiffs.

Mary Apostolakos Hervey, United States Department of Justice, Washington, DC, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing in the above-captioned adversary proceeding.

The parties stipulate that the Debtors, David B. Jones and Linda S. Jones, "are indebted to the Internal Revenue Service for unpaid 1040 taxes for the year ending December 31, 1993, plus statutory additions." (Doc. 11, Joint Pre–Trial Statement, p. 3).

The issue in this adversary proceeding is whether the 1993 income taxes owed by the Debtors are nondischargeable pursuant to § 523(a)(1)(C) of the Bankruptcy Code because the Debtors "made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."

### Background

In 1986, the Debtor, David B. Jones (Mr. Jones), or his solely-owned corporation, Magic Toyota, Inc., purchased and began to operate a Toyota dealership in South Carolina.

On April 1, 1991, Mr. Jones and Magic Toyota, Inc. filed a Complaint against Southeast Toyota Distributors, Inc. (Southeast) and other defendants in the United States District Court in South Carolina. (IRS Exhibit 8). The Complaint arose from the purchase and operation of the Toyota dealership.

On or about May 2, 1991, Mr. Jones and Magic Toyota filed an Amended Complaint against Southeast and the other defendants. (IRS Exhibit 9; Debtors' Exhibit 1). The Amended Complaint contained six counts: (1) Breach of contract; (2) Violation of South Carolina Code Section 39–5–10 regarding unfair competition and deceptive trade practices; (3) Violation of the Racketeer Influenced and Corrupt Organizations Act; (4) Fraud; (5) Actual and punitive damages for unfair competition and deceptive practices; and (6) Injunctive relief.

The Debtor, Linda S. Jones (Mrs. Jones), was not named as a plaintiff in the District Court action. Mr. Jones testified that he made the decision not to include Mrs. Jones as a party to the action because she suffered from certain physical

and mental conditions that affected her health, and he did not want to subject her to the stress of the lawsuit. (Transcript, pp. 56, 96–97).

The South Carolina action was settled in principle on May 28, 1993, as memorialized in a letter from Southeast's general counsel to Mr. Jones' attorney. (Debtors' Exhibit 5; IRS Exhibit 18).

On June 24, 1993, Mr. and Mrs. Jones signed a General Release. (IRS Exhibit 14). In the Release, the Debtors released Southeast and the other defendants from "any and all claims, causes of action, suits and demands whatsoever in law or in equity."

Four days later, on June 28, 1993, Mr. and Mrs. Jones signed a document entitled "Settlement Agreement" that was filed in the District Court. (IRS Exhibit 13). Pursuant to the document, the Debtors authorized their attorneys to settle their individual claims in the District Court action for the sum of $4,360,417.00.

On the same date, June 28, 1993, a settlement check was issued to Mr. and Mrs. Jones in the amount of $2,719,879.00. A separate settlement check was issued to Magic Toyota in the amount of $866,773.00. (Debtors' Exhibit 11; IRS Exhibit 20).

Approximately six weeks later, on August 11, 1993, the Debtors' attorney wrote a letter to Mr. Jones, which stated as follows:

> I spoke with Taylor Ward [Southeast's attorney] today who approved the change of language in your General Release to incorporate language that the payment to you and Linda was for your personal injuries, which was always the intent of the settlement and original release. This change of language does not modify the release agreement at all, it simply states expressly what was otherwise implied from the language of "all

claims, causes of action, suits and demands whatsoever in law or in equity . . ."

(Debtors' Exhibit 8; IRS Exhibit 19).

The following day, August 12, 1993, Mr. and Mrs. Jones signed two documents. First, they signed a Settlement Agreement which was intended to resolve all disputes between Mr. and Mrs. Jones and Magic Toyota, on one hand, and Southeast and the other defendants on the other hand. (Debtors' Exhibit 6; Exhibit 8 to IRS Exhibit 32). The Agreement provided that Southeast would pay to Mr. and Mrs. Jones and their attorneys the sum of $4,360,417.00, and that Southeast would pay to Magic Toyota and its attorneys the sum of $1,389,583.00. The Agreement also provided for the execution of Releases by Mr. and Mrs. Jones and by Southeast and the other defendants.

Second, in accordance with the Settlement Agreement and the letter from their attorney dated August 11, 1993, Mr. and Mrs. Jones signed a revised General Release on August 12, 1993. (Debtors' Exhibit 7; IRS Exhibit 16). The revised Release provided that Mr. and Mrs. Jones and Magic Toyota "for and in consideration of the payment of $4,360,417.00 to David and Linda Jones *for their personal injuries* and $1,389,583.00 to Magic Toyota, Inc. the receipt and sufficiency of which is hereby acknowledged," released Southeast and the other defendants "from any and all claims, causes of action, suits and demands whatsoever in law or in equity." (Emphasis supplied).

On April 14, 1994, Mr. and Mrs. Jones signed their Form 1040 Individual Income Tax Return for the 1993 tax year. (IRS Exhibit 21). The Return was prepared by a Certified Public Accountant. (Transcript, p. 25).

The words "see attached" are typed on the first page of the Debtors' Tax Return in response to item number 22, which requires the taxpayer to list the type and amount of "other income." The "supporting schedule of other income" that is attached to the Return identifies the sum of $4,360,417.00 that was received by the Debtors from Southeast Toyota, and then subtracts the full amount of the income as "amount awarded for personal injury under IRC Sec 104. See attached." A copy of the General Release signed by the Debtors on August 12, 1993, is attached to the Return.

Generally, § 104 of the Internal Revenue Code provides that gross income does not include the amount of any damages received "on account of personal injuries or sickness."

On February 19, 1997, almost three years after the 1993 Tax Return was filed, the IRS wrote the Debtors a letter in which it asserted that the receipt of the settlement amount was taxable income that should have been reported on the Return. (IRS Exhibit 22).

On April 7, 1997, the IRS issued a Notice of Deficiency regarding the Debtors' 1993 Return. (Debtors' Exhibit 16). In the Notice, the IRS identified a tax deficiency in the amount of $1,722,536.00, plus certain additions to the tax in the amount of $344,507.00.

On February 15, 1999, Mr. Jones transferred certain real property located in Polk County, Florida to Payday Cars, Inc. (IRS Exhibit 4). Mr. Jones testified that the property consisted of a warehouse that he had purchased on November 29, 1994. Although he had initially acquired the property in his individual name, Mr. Jones testified that the warehouse had been purchased to house the operations of Payday Cars, and that Payday Cars had always used the property. Mr. Jones is the sole owner of Payday Cars, Inc. (Transcript, pp. 66–67, 141–42).

On February 17, 1999, two days after the transfer of the warehouse, Mr. and Mrs. Jones executed a Quitclaim Deed of certain real property in Tennessee to Mr. Jones' mother, Wanda Lee Jones, and to his sister, Nancy Lee Reinecke. (IRS Exhibit 3). Mr. Jones testified that he had contributed the sum of $30,000.00 in 1995 to purchase the property as a home for his mother upon her retirement. Even though the property was initially titled in his name, his mother had made the payments on the home since it was purchased, and had invested her own personal funds for improvements to the property. Consequently, Mr. Jones transferred the property to his mother and sister in 1999 to ensure that his mother retained her home. (Transcript, pp. 69–70, 143–45).

On April 12, 1999, Mr. and Mrs. Jones filed a petition under Chapter 11 of the Bankruptcy Code. (Case No. 99–5737). The IRS filed a Proof of Claim in the Chapter 11 case in the amount of $2,991,771.11 based on the Debtor's income tax liabilities for the 1993 tax year. The Debtor objected to the Claim on the basis that the settlement proceeds were excluded from their gross income in 1993 by virtue of § 104 of the Internal Revenue Code.

On September 6, 2001, the Court entered an Order regarding the Claim. In the Order, the Court found that the settlement funds received by the Debtors were not "on account of personal injuries or sickness," and therefore were not excluded from the Debtors' income. The Claim was allowed as filed in the amount of $2,991,771.11. The Debtors subsequently dismissed the Chapter 11 case.

On May 19, 2005, the Debtors filed a petition under Chapter 7 of the Bankrupt-

cy Code, and thereafter filed the Complaint to Determine Dischargeability of Debt that is currently before the Court.

### Discussion

As set forth above, the primary issue in this case is whether the income taxes owed by the Debtors are nondischargeable pursuant to § 523(a)(1)(C) of the Bankruptcy Code because the Debtors "made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."

Section 523(a)(1)(C) provides as follows:

**11 USC § 523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

 . . . . .

■ (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax.

11 U.S.C. § 523(a)(1)(C). The creditor bears the burden of proof that a particular claim is nondischargeable under § 523(a). *In re Fretz*, 244 F.3d 1323, 1327 (11th Cir.2001).

### A. Fraudulent return

■ Under the first prong of § 523(a)(1)(C), a tax may be nondischargeable if the debtor made a fraudulent return.

■ To establish that the debtor made a fraudulent return within the meaning of the section, the IRS must show the following elements: (1) that the debtor had knowledge of the falsity of the return; (2) that the debtor had an intent to evade the taxes; and (3) that there was an underpayment of the taxes. *In re Binkley*, 242 B.R.

728, 733 (M.D.Fla.1999); *In re Fliss*, 339 B.R. 481, 486 (Bankr.N.D.Iowa 2006).

■ Generally, courts look to external factors or the totality of the circumstances to determine whether the debtor possessed the intent required for a debt to be nondischargeable under § 523(a)(1)(C). *In re Binkley*, 242 B.R. at 733; *In re Fliss*, 339 B.R. at 486–87.

In this case, the Court finds that the Debtors did not file a fraudulent return for purposes of § 523(a)(1)(C) of the Bankruptcy Code. In reaching this decision, the Court is persuaded by the reasoning of *In re Schlesinger*, 290 B.R. 529 (Bankr. E.D.Pa.2002).

In *Schlesinger*, the debtor had claimed substantial loss deductions against ordinary income on his tax return, even though he did not have the documentation necessary to support the full amount of the deductions. The IRS challenged the deductions, and ultimately assessed the debtor's tax liability without the loss carrybacks and carryforwards that the deductions had yielded.

The debtor later filed a petition under Chapter 7, and commenced an adversary proceeding to determine the dischargeability of the tax liability. The IRS responded by asserting that the tax debt was nondischargeable because it arose from a fraudulent return or a willful attempt to evade or defeat the tax. *In re Schlesinger*, 290 B.R. at 534–35.

The Court framed the issue as whether the IRS had proven by a preponderance of the evidence that it was more likely than not that the debtor knew when he filed his tax return that the claimed deductions had no real basis in fact or law, and that they were claimed wrongfully either to avoid payment of the tax or to obtain an improper refund. *Id.* at 539.

In resolving the issue, the Court focused on the credibility of the debtor's testimony regarding the existence of the business losses and the unavailability of supporting documentation to support the losses. *Id.*

Based on the testimony and the evidence, the Court was satisfied that the debtor had sustained actual, substantial losses as a result of a business investment and was therefore entitled to claim at least a portion of the deductions, that his failure to maintain adequate records was careless and even negligent but not fraudulent, that he claimed the deductions after consultation with an experienced accountant who also testified that the investment losses equaled the amount claimed, and that the nature of the deductions and the lack of documentation was fully disclosed on the tax return. *Id.* at 538–41.

The Court concluded, therefore, that the IRS had not met its burden of proof under § 523(a)(1)(C). *Id.* at 540. Because the debtor genuinely believed that the deductions were valid, and because his belief had a real basis in fact or law, the Court determined that the tax return was not fraudulent and that the debtor's tax liability was dischargeable in his bankruptcy case. *Id.* at 540–41.

Similarly, in this case, the IRS appears to acknowledge that the Debtors suffered actual personal injuries as a result of Southeast's conduct. (Transcript, p. 15).

Further, it is not disputed that Mrs. Jones suffers from severe manic depression, bipolar disorder, agoraphobia, and other psychological disorders that have required her extended hospitalization on at least one occasion. (Transcript, pp. 71–72).

The Complaint filed against Southeast, of course, does not expressly seek damages based on the Debtors' personal injuries. Mr. Jones consistently testified, however, that he made the decision not to name Mrs. Jones as a plaintiff in the action, and not to raise the personal injury issues at the outset of the lawsuit, because of Mrs. Jones' fragile health. (Transcript, pp. 56, 96–97). According to Mr. Jones, he and his attorneys planned to amend the Complaint prior to settlement to include their personal injury claims. (Transcript, p. 97).

Additionally, Mr. Jones testified that Southeast was aware of the personal injury claims throughout the litigation, in part because of Southeast's attempts to depose Mrs. Jones, and Mr. Jones' resistance to the proposed deposition. (Transcript, p. 57).

Mr. Jones further testified that it was clear during the course of the settlement negotiations that the Debtors were asserting personal injury claims. (Transcript, p. 155). He understood that the settlement process was "being handled on a personal injury basis" with respect to the Debtors' individual claims. (Transcript, p. 157). In Mr. Jones' view, therefore, the allocation of the settlement proceeds accurately reflected the true basis of the resolution: a portion of the settlement was allocated to Magic Toyota for its economic damages, and a portion of the settlement was allocated to the Debtors for their personal injuries. (Transcript, pp. 155, 157).

Mr. Jones' subjective belief as to the allocation of the settlement fund is at least partially corroborated by an internal memorandum that was apparently prepared by a member of Southeast's tax department. In the unsigned memorandum dated in June of 1993, the author typed: "Paid $5,750,000 by wire transfer. Per Colin Brown the individuals were paid for 'personal injuries' in the amount of 4,360,417 and Magic Toyota, Inc. was paid 1,389,583. No 1099 is required." (Debtors' Exhibit 15).

Mr. Jones' subjective belief is also corroborated by a letter from his attorney written on August 11, 1993. In the letter, his attorney stated that he had spoken with Southeast's attorney, and that Southeast "approved the change of language in your General Release to incorporate language that the payment to you and Linda was for your personal injuries, which was always the intent of the settlement and original release." (Debtors' Exhibit 8; IRS Exhibit 19).

Based on the history of the litigation, Mr. Jones believed that he was entitled to exclude the settlement funds from income on his Tax Return for the 1993 tax year. (Transcript, p. 134).

Finally, and perhaps most importantly, the Debtors' receipt of the settlement funds was disclosed on the Return, which was prepared by a certified public accountant. (IRS Exhibit 21; Transcript, p. 25).

The words "see attached" are typed on the first page of the Return in response to item number 22, which requires the taxpayer to list the type and amount of "other income." The "supporting schedule of other income" that is attached to the Return identifies the sum of $4,360,417.00 that was received from Southeast, and then subtracts the full amount of the income as "amount awarded for personal injury under IRC Sec. 104. See attached." A copy of the General Release signed by the Debtors on August 12, 1993, is attached to the Return.

The Debtors' recovery from Southeast was not concealed from the IRS.

In short, the Debtors sustained actual personal injuries as a result of Southeast's conduct, the Debtors had sufficient reason to believe that the settlement payment from Southeast was made to them on account of their personal injuries, the Tax Return was prepared by a professional,

and the Tax Return disclosed the receipt of the settlement funds.

In this case, as in *Schlesinger,* the IRS did not satisfy its burden of proving that the Debtors filed a fraudulent Tax Return. In other words, the IRS did not show that it is more likely than not that the Debtors knew when they filed the Tax Return that the exclusion from income had no real basis in law or fact. See *In re Schlesinger,* 290 B.R. at 539. The tax liability is not excepted from discharge pursuant to the first prong of § 523(a)(1)(C) of the Bankruptcy Code.

### B. Willful attempt to evade the tax

As set forth above, a tax may be nondischargeable under the second prong of § 523(a)(1)(C) if the debtor willfully attempts in any manner to evade or defeat such tax.

Two elements of the statute must be satisfied for the tax debt to be nondischargeable. The attempt to evade or defeat the tax must be "willful," and the debtor must have engaged in "conduct" evidencing his attempt to evade or defeat the tax. *In re O'Callaghan,* 316 B.R. 550, 554 (Bankr.M.D.Fla.2004).

To prove the "willful" element of the cause of action, the IRS must show that the debtor "(1) had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty." *In re Fretz,* 244 F.3d 1323, 1330 (11th Cir.2001). Courts must often rely on circumstantial evidence, or badges of fraud, to determine whether a debtor intended to violate his duty to pay taxes. *In re Cole,* 328 B.R. 237, 241 (Bankr.M.D.Fla.2005).

To prove the "conduct" element of the cause of action, the IRS must show that the debtor's nonpayment of a tax is coupled with "specific conduct evidencing

his attempts to evade or defeat the payment." *In re O'Callaghan*, 316 B.R. at 555. The "conduct" requirement is satisfied "where a debtor engages in affirmative acts to avoid payment or collection of taxes." *In re Fretz*, 244 F.3d at 1328–29(citing *In re Haas*, 48 F.3d 1153 (11th Cir.1995) and *In re Griffith*, 206 F.3d 1389 (11th Cir.2000)).

In this case, according to the IRS, the Debtors did not assert that they had been paid for their personal injuries until after the litigation had concluded. In other words, the IRS contends that the Debtors initially filed the Complaint seeking only economic damages against Southeast, and did not disclose their claim for personal injuries in any of the responses to discovery that they submitted to the Court or to Southeast. (IRS Exhibits 10, 11, 12). The Settlement Agreement that they executed did not mention personal injuries, the original Release did not mention personal injuries, and the settlement checks were issued in June of 1993 on the basis of the existing documents.

The IRS asserts that the Debtors realized that the settlement funds would be taxable only after the agreement had been consummated, and therefore asked their attorneys to prepare the revised Release simply as an after-the-fact attempt to change the true character of the settlement. (Transcript, pp. 131, 133).

Further, after the taxes had been assessed on the settlement proceeds, the IRS asserts that the Debtors transferred certain assets to avoid the government's collection efforts. Specifically, Mr. Jones transferred certain "warehouse" property to his solely-owned corporation, Payday Cars, Inc., and the Debtors also transferred their interest in a home in Tennessee to Mr. Jones' mother and sister.

Based on the facts and conduct described above, the IRS contends that the Debtors willfully attempted to evade or defeat their 1993 tax liability.

The Court concludes, however, that the Debtors did not intend to violate their duty to pay taxes within the meaning of § 523(a)(1)(C) of the Bankruptcy Code.

### 1. The revised Release

█ As discussed above, it appears undisputed that the Debtors suffered actual personal injuries as a result of Southeast's conduct. (Transcript, p. 15). It is also undisputed that Mrs. Jones suffers from severe psychological disorders that require ongoing treatment. (Transcript, pp. 71–72).

Further, Mr. Jones credibly testified that Southeast was aware of the Debtors' personal injury claims throughout the litigation, even though the claims were not expressly asserted in the Complaint. According to Mr. Jones, it was clear during the course of the settlement negotiations that the Debtors were seeking damages on account of their personal injuries. (Transcript, pp. 57, 155, 157).

Mr. Jones' understanding of the settlement discussions is corroborated by an internal memorandum contained in Southeast's files that refers to the settlement checks as paid to the Debtors for their "personal injuries." (Debtors' Exhibit 15). His understanding is also corroborated by a letter written by his attorney, advising Mr. Jones that Southeast had approved a change in the Release to provide that the settlement payment to the Debtors was for personal injuries, "which was always the intent of the settlement and original release." (Debtors' Exhibit 8; IRS Exhibit 19).

Even though Mr. Jones believed that the claims against Southeast included claims for personal injuries, it is clear that the court documents and the settlement

documents did not reflect the nature of those claims. According to Mr. Jones, however, he and his attorneys had discussed the claims since the initiation of the litigation, and had planned to formally add the claims prior to settlement. (Transcript, p. 97). Mr. Jones further testified that he had relied on his attorneys to include sufficient language in the settlement papers to reflect that the payment was intended to compensate the Debtors for their personal injuries, but that the initial documents contained only broad language regarding the scope of the release. (Transcript, pp. 125–26). Consequently, to correct the omission, Mr. Jones insisted that the Release be revised to refer specifically to the Debtors' personal injury claims, as always intended and as approved by Southeast. (Transcript, p. 130, 134, 139).

Based on the historical facts underlying the litigation, as well as the course of the litigation itself, the Debtors believed that they were entitled to exclude the settlement proceeds from the income reported on their Tax Return.

Further, the Debtors' 1993 Tax Return was prepared in conformity with their understanding. The proceeds were disclosed on the Return as "other income." The disclosure included the amount of the settlement, and a copy of the second General Release that identified Southeast as the party to the agreement. (IRS Exhibit 21). The Debtors did not attempt to conceal the receipt of the settlement funds from the IRS.

Neither the Debtors' conduct in obtaining the revised General Release, nor their treatment of the settlement funds on their Tax Return, constituted a willful attempt to evade or defeat the taxes owed by the Debtors for the 1993 tax year. See *In re Burgess*, 199 B.R. 201 (Bankr.N.D.Ala.

1996), and *In re Irvine*, 163 B.R. 983 (Bankr.E.D.Pa.1994).

### 2. The transfers

Further, the Court finds that the Debtors satisfactorily explained the two transfers of real property that occurred in 1999, and that the transfers do not evidence the Debtors' attempt to evade their tax liability.

With respect to the warehouse located in Polk County, for example, Mr. Jones testified that he acquired the property in 1994 for a car business, Payday Cars, Inc., that he formed that year. Although he purchased the property with personal funds because the corporation was not yet capitalized, the warehouse was always used by the corporation and maintained on the corporation's books. Mr. Jones transferred the property to Payday Cars, Inc. in February of 1999 to reflect ownership of the warehouse by the entity that actually used the property and that was always the intended recipient. (IRS Exhibit 4; Transcript, pp. 66–68, 141–42).

With respect to the Tennessee property, Mr. Jones testified that he furnished the $30,000.00 down payment to purchase the home for his mother in 1995, before the IRS audited the Debtors' 1993 Tax Return. The home was purchased as his mother's primary residence upon her retirement, and she made the mortgage payments and invested her own funds to improve the property. The home was originally owned by the Debtors and Mr. Jones' mother. In February of 1999, the Debtors quitclaimed their interest in the home to Mr. Jones' mother and sister to clarify that his mother was the true owner of the property. (IRS Exhibit 3; Transcript, pp. 69–70, 143–45).

Based on the Debtors' unrefuted explanation of the transfers, as well as the surrounding circumstances, the Court

finds that the Debtors did not transfer the warehouse or the Tennessee property with the intent to evade or defeat their taxes within the meaning of § 523(a)(1)(C) of the Bankruptcy Code.

### 3. The forgiveness of debt

 Finally, the IRS contends that the settlement package with Southeast and the other defendants included the forgiveness of a $220,000.00 judgment that had been entered against the Debtors individually. According to the IRS, the forgiveness of this debt, which represented a purely financial obligation, constituted income to the Debtors that should have been reported on their Tax Return. (Transcript, pp. 20–21).

For purposes of this dischargeability proceeding, however, the issue is not whether the forgiveness of the debt constituted a taxable event to the Debtors. Instead, the issue in this case is whether the Debtors willfully attempted to evade or defeat the tax liability.

Based on the record, the Court finds that any tax that arose from the forgiveness of the judgment debt is dischargeable.

The judgment was not dealt with as a discrete item in the settlement agreement with Southeast. The letter setting forth the parties' agreement in principle, for example, simply stated that the lawsuit would be settled on the same terms and conditions as a separate action that had been filed against Southeast by a third party. (Debtors' Exhibit 5; IRS Exhibit 18).

Similarly, the Settlement Agreement that was filed with the Court on or about June 28, 1993, disclosed the total amount of the settlement as a lump sum, and also disclosed the distribution of the funds among the Debtors and their attorneys, but did not explain how the settlement amount was calculated. (IRS Exhibit 13). Finally, the Settlement Agreement that was signed by Southeast on July 9, 1993, and by the Debtors on August 12, 1993, provided only that Southeast would pay the sum of $4,360,417.00 to the Debtors, and the sum of $1,389,583.00 to Magic Toyota. Although the Agreement also provided that Southeast and the other defendants would "forgive any and all outstanding judgments," the document does not specifically identify any such judgments or expressly include them as a component of the settlement agreement. (Debtors' Exhibit 6).

In other words, it appears that the settlement was presented simply as a single, lump sum payment from Southeast to the Debtors. The record does not show whether or not the total settlement amount was attributed to specific, identified claims between the parties, or whether the Debtors knew that the judgment was a component of the settlement package.

Additionally, Mr. Jones testified that the judgment arose from the Debtors' personal guarantee of a floor plan debt owed by Magic Toyota, Inc. to World Omni Financial Corporation. (Transcript, pp. 64, 153). Because of its origin, Mr. Jones viewed the obligation as a corporate debt, even though the judgment was entered against the Debtors individually. (Transcript, pp. 94–95).

In sum, the judgment arose from the Debtors' guarantee of a corporate debt, and the Settlement Agreement did not identify the judgment as a specific component of the total settlement package. Under these circumstances, the Court finds that the Debtors' failure to report the forgiveness of the debt on their Tax Return did not constitute a willful attempt to

evade or defeat the tax resulting from such forgiveness.

## Conclusion

The issue in this case is whether the income tax liabilities owed by the Debtors for the 1993 tax year are nondischargeable pursuant to § 523(a)(1)(C) of the Bankruptcy Code because the Debtors "made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." The Court finds that the taxes are dischargeable.

First, the IRS did not satisfy its burden of proving that the Debtors filed a fraudulent Tax Return. Specifically, the IRS did not show that the Debtors knew when they filed the Return that there was no real basis in law or fact to claim that the settlement funds were paid "on account of personal injury." The Tax Return was not fraudulent simply because the Debtors' belief regarding the excludability of the income ultimately proved to be wrong. *In re Schlesinger*, 290 B.R. at 540–41.

Second, the IRS did not satisfy its burden of proving that the Debtors willfully attempted to evade or defeat the tax. Under the particular circumstances of this case, the Debtors had sufficient reason to believe that the settlement funds were paid on account of their personal injuries, and they obtained the revised General Release to document the basis for the payment. Additionally, the Debtors adequately explained the circumstances surrounding the transfers of property that occurred in 1999, and the Court is satisfied that the transfers were not made with the intent to evade or defeat the Debtors' 1993 tax liability within the meaning of § 523(a)(1)(C).

Accordingly:

**IT IS ORDERED** that:

1. The tax liabilities of the Debtors, David B. Jones and Linda S. Jones, for the 1993 tax year are not excepted from the Debtors' discharge pursuant to § 523(a)(1)(C) of the Bankruptcy Code, and are therefore dischargeable in the Debtors' Chapter 7 case.

2. A separate Final Judgment will be entered on the Complaint to Determine Dischargeability of Debt in favor of the Debtors, David B. Jones and Linda S. Jones, and against the Defendant, the United States of America, Internal Revenue Service.